PORTO RICO MERCANTILE COMPANY, Complainant,

*v.*

JUAN G. GALLARDO, AS TREASURER OF PORTO RICO, Dft.

San Juan, Equity, No. 1252.

Opinion filed June 9, 1924.

*Mr. O. B. Frazer* and *Mr. Nelson Gammans* for complainant.

*Honorable H. P. Coats,* Attorney General of Porto Rico, and *Mr. J. A. Lopez Acosta,* Assistant Attorney General of Porto Rico, for the defendant.

ODLIN, Judge, delivered the following opinion:

The bill in the present case was filed on May 3, 1924, and seeks to enjoin the defendant, who is the treasurer of Porto Rico, from enforcing the collection of certain sums claimed to be due to the people of Porto Rico by the complainant as unpaid income taxes and excess profits taxes which had been assessed against the complainant by a former treasurer of Porto Rico for the calendar years 1918, 1919, and 1921. The bill has been answered and testimony has been taken.

With respect to one of the defenses embodied in the answer, which is to the effect that this court is without jurisdiction because the complainant has a plain, adequate, and complete remedy at law, it is sufficient to say that in accordance with the former order and opinion of this court rendered June 26, 1923 [ante, 157], in a former suit between the Porto Rico Mercantile Company and J. W. Bonner, who at that time was treasurer of Porto Rico, this court decided that there existed no plain, adequate, and complete remedy at law, and therefore the complainant was entitled to file a bill in equity in this court. It is not necessary to repeat in this opinion the reasons which were given in the former case. With regard to this former case, after the court decided that it was its duty to grant a temporary injunction on June 26, 1923, the case was heard upon its merits, and on January 4, 1924 [ante, 263], while J. W. Bonner was living and acting as treasurer of Porto Rico, an order and opinion was rendered by this court to the effect that the treasurer of Porto Rico was not entitled to collect any income tax or any excess profits tax with regard to molasses which was produced in the Dominican Republic, brought to Porto Rico,

stored in tanks in this Island, and then ultimately sold by virtue of contracts entered into at New York or at Boston; but with respect to the molasses which was produced in Porto Rico, the treasurer of Porto Rico was entitled to collect income taxes and excess profits taxes.

It is to be noted with respect to this opinion rendered January 4, 1924, that the records of this court show that the first suit had been brought against Ramon Aboy, Jr., while he was occupying the position of treasurer of Porto Rico, and that J. W. Bonner, who was acting as treasurer on January 4, 1924, had been substituted as the defendant in the suit by consent of parties. Of course it might be contended by extremely meticulous counsel that the first suit abated and that J. W. Bonner in his capacity of treasurer of Porto Rico was not bound by the decision of this court rendered on January 4, 1924, even though counsel consented to the substitution. I am well aware that courts have held that a suit of this nature would abate even though the parties consented. However, it is fair to say that whether the order and opinion of this court rendered on January 4, 1924, is binding or is not binding, I am of the opinion that the rule therein laid down is correct, and must be applied to the present case.

Coming to the present case, counsel for the complainant rely very strongly upon three strong opinions which were submitted on November 3, 1920, to the then Secretary of the Treasury of the United States by the Honorable W. L. Frierson, who was then the Acting Attorney General. These opinions may be found in the volume entitled, "The Corporation Trust Company, 1920 Income Tax Service," §§ 2994 et seq.

The first of these three opinions relates to the firm of Burleigh

& Sons, a corporation organized under the laws of Scotland, owning and operating two sawmills in the United States, one in Arkansas and the other in Kentucky. These mills were used to saw logs into plank squares called handle blanks, and also they produced hammer handles which were roughly turned. These products were all exported to Glasgow and finished at the home mill there. The manager of the American plant bought logs in the United States and also exported some of them as such to Great Britain. No part of the products of the mills located in this country or of the logs purchased in this country were sold in the United States, but the entire output was sold in Great Britain. Mr. Frierson decided that there was no gross income whatever from sources within the United States within the meaning of the Federal Income Tax Law. Burleigh & Sons were relieved from any payment.

The next case passed upon by Mr. Frierson was that of Paton & Company, a partnership organized in England, consisting of two members who were subjects of Great Britain and who resided in that country. They had their principal office in Liverpool, England, but also maintained an office in the state of Texas. The manager of this Texas office received a fixed salary and a stipulated commission based upon the net earnings of the firm, in accordance with a contract of employment between the members of the firm and himself. The Texas office had a name slightly different from the partnership, and it was claimed that this Texas firm was merely a buying agency for the home office and that this name was given to the branch for book record purposes and in order to distinguish the firm's transactions in Liverpool from those of its agency in the United States. The business carried on was that of cotton merchants and importers.

The branch office in Texas was engaged in buying cotton in the United States in behalf of the English partnership and then shipping it to the office in England to be disposed of there. It was the custom of the Texas office to draw upon the English parent office for amounts sufficient to make the purchases, together with a liberal margin to cover estimated charges and expenses so that at the end of the season the branch office might show a balance to its credit. It was claimed that this balance represented merely the difference between the total amount at which the cotton shipments for the season were invoiced to Liverpool and the total purchase price plus ordinary and necessary costs of handling the cotton, and the expenses of the agency. The branch office in Texas, however, never made any sales. Mr. Frierson held that these people were exempt from paying income taxes in the United States.

The third case was that of C. M. Lampson & Company, a partnership organized in England consisting of six members, five of whom were British subjects residing in London. The remaining member was a citizen of the United States who lived in New York city. The firm had its home office in London, but maintained a branch in New York city in charge of the partner there residing, and conducted under his name. The business of the partnership was that of commission merchants in raw furs. These were consigned to the partnership from various parts of the world, including the United States, the sales being made almost entirely in London at auction by auctioneers employed by the firm, or sometimes at private sales. The firm did not at any time take title to the goods, but the title remained in the consignor until the sale, when it passed to the purchaser. The principal duty of the New York office was to solicit con-

signments of raw furs to the London house, and the resident partner in New York was required to travel to various points in the United States and Canada. Most of the goods consigned from Canada were sent to New York and then reshipped to London. The New York office also acted as disbursing agent for the British firm in paying to the consignors in the United States and Canada the proceeds of the sales of the goods in London; also attended to the shipping of the goods to London, and their storage and their insurance in New York while waiting for steamers; also was in the custom of making advances to consignors on the security of bills of lading or express receipts. The money needed to maintain the New York office was obtained by selling drafts on London, and a balance of about $20,000 was usually carried in a New York bank. The income of the partnership was derived from a commission of about 6% on the proceeds of the sales of furs consigned to it. The firm collected the proceeds of the sales and deducted its commissions, expenses incurred for freight, insurance, or storage, and also the amount of advances made to the consignors. The balance of the proceeds was remitted to these consignors. No profit was made upon the freight or other charges. Mr. Frierson held that this case fell in the same class with the other cases and that the partnership was deriving no income from sources within the United States, and that with respect to C. M. Lampson & Company the United States had the right to tax only the income of the one member of the firm who resided in New York, and who was a citizen of the United States.

Now, it must be admitted that these opinions of an experienced and careful lawyer like Mr. Frierson, representing the United States, deserve great persuasive force, but there is

a fixed rule of law which requires a court of equity to deny an injunction in a case like the present one, unless the right of the complainant thereto is made plain to the court. It seems to me that the present controversy must be decided against the complainant by reason of the doctrines laid down in a case which originated under the title of Shaffer v. Howard as State Auditor, the title of which afterwards was changed to Shaffer v. Carter as state auditor. The litigation began in 1918 in the Federal court for the eastern district of Oklahoma. Charles B. Shaffer was a taxpayer, and E. B. Howard was then state auditor. Shaffer filed a bill in equity against Howard as state auditor asking for a temporary injunction, and the case was heard before three judges, in accordance with the important rule which prevails in all Federal courts, except those situated like this court in Porto Rico, which rule provides that no injunction shall issue against a state officer unless heard by three judges. The geographical situation of Porto Rico is such that the burden placed upon the one judge of the present court is thus seen to be much greater than that which rests upon a Federal judge in any one of the forty-eight states of the Union. Two of the three judges who sat in the Oklahoma Case were of the opinion that the motion for the temporary injunction should be denied. Interesting opinions are found in 250 Fed. beginning at page 873. Later Mr. Howard ceased to be state auditor, his successor being a gentleman by the name of Carter, which explains why the decision of the United States Supreme Court on March 1, 1920, reported in 252 U. S. 37, 64 L. ed. 445, 40 Sup. Ct. Rep. 221, is found under the title of Shaffer v. Carter as state auditor. The very interesting opinion was written by Mr. Justice Pitney in this case, all the other justices concurring

except Mr. Justice McReynolds, who dissented without an opinion.

The Supreme Court of the United States held that the Oklahoma laws failed to afford a legal remedy for removing a cloud upon the property of a taxpayer which might be caused by an invalid lien for an income tax, and therefore decided that a Federal court of equity did have jurisdiction to pass upon the question. The Supreme Court also held that a state is entitled to tax income derived from local property and business owned and managed from without by a citizen and resident of another state; that this power is entirely consistent with art. 4, § 2, of the Federal Constitution, which guarantees privileges and immunities, and also consistent with the equal protection clause of the 14th Amendment.

The Supreme Court also held that the constitutionality of such an income tax depends upon its practical operation and effect, and not upon mere definitions or theoretical distinctions respecting its nature and its quality. The Supreme Court also held that net income derived from interstate commerce might be taxable under a state law providing for a general income tax. Also that the Oklahoma gross production tax, imposed on oil and gas producing companies, was intended as a substitute for the ad valorem property tax, and payment of it therefore did not relieve the producer from taxation under the state income tax law.

The Supreme Court also held that the Federal Constitution, including the 14th Amendment, did not forbid double taxation by the states. In this case, Shaffer, the complainant, resided in Illinois and was engaged in the oil business in Oklahoma, he having purchased, owned, developed and operated a number of

oil and gas mining leases, and was the owner in fee of certain oil-producing land in that state, Oklahoma. The state of Oklahoma claimed from Shaffer an income tax of $76,000. An examination of the opinion of Mr. Justice Pitney in this case and the language used by him convinces me that it is my duty to dismiss the present bill.

It is conceded that the complainant is a corporation organized under the laws of the state of West Virginia; that it has its principal office in the city of New York; that one of its directors receives a salary as manager of its business in Porto Rico, which consists wholly in buying and storing molasses, but that no sales are made in Porto Rico. The bill of complaint is very long and very carefully drawn. After careful consideration of the matter, however, it seems to me that the doctrines laid down by the Supreme Court in the case last cited must control the present case, and that the treasury of Porto Rico is entitled to receive from the Porto Rico Mercantile Company the lawful tax claimed by the treasury of Porto Rico upon the profits made by the Porto Rico Mercantile Co. for the years stated in the bill, so far as the same affect the molasses which was produced in this Island, even though the sales thereof were made in New York.

A question arose as to the propriety and fairness of the officials of the Treasury Department using the percentage system in the computation of this tax, but it is my view that the complainant is not in a position to object to the use of this percentage system, because it was frankly admitted by the Porto Rican manager of the complainant corporation that the molasses brought from the Dominican Republic and stored in this Island was placed in the same tank or tanks containing molasses pro-

428

duced in Porto Rico. Therefore, it seems to me that the percentage system is the only one that could be used. At all events, I consider that the treasury of Porto Rico is entitled to its money, and so hold.

The bill is dismissed with costs.

To this order and opinion counsel for the Porto Rico Mercantile Company except.

Done and Ordered in open court at San Juan, Porto Rico, this 9th day of June, 1924.